Application of LAFAYETTE ACADEMY, INC., Lafayette Motivation Media, Inc., Educational Lending Corporation, Lafayette United Corporation, Jewelry By St. Tropez, and Glick Enterprises, Inc.

Misc. No. 78–36.

United States District Court,
D. Rhode Island.

Dec. 14, 1978.

Herbert F. DeSimone, of DeSimone, Del Sesto & Del Sesto, Providence, R. I., and Peter J. Mansbach, and Harvey J. Lippman, of Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for movants.

Paul F. Murray, U. S. Atty., Everett Sammartino, Asst. U. S. Atty., Providence, R. I., for the opposition.

## OPINION AND ORDER

FRANCIS J. BOYLE, District Judge.

This action arises by reason of motions for return of property in accord with Rule 41(e) *Fed.R.Crim.P.* and for other relief on behalf of six corporations concerning documents seized on September 16, 1977, in connection with a grand jury investigation, purportedly authorized by a search warrant issued on the previous day. The search warrant authorized a search of a two story building, its basement and the leased trash receptacle adjacent to the building all located at Number 984 Charles Street, in the Town of North Providence, within this District. The movants seek an order that the documents be returned, that each and every item seized shall be determined inadmissible at any hearing or trial, and that none of the items seized be made available to any other "branch or organ" of the Government. Movants assert the entire panoply of grounds including Constitutional violations, lack of probable cause in the supporting affidavit, failure to specify the items to be seized, and, the conduct of a "fishing expedition as a consequence of the mere suspicions, conjectures or surmise entertained by another administrative agency."

The movants are Lafayette Academy, Inc., Lafayette Motivation Media, Inc., Educational Lending Corporation, Lafayette United Corporation, Jewelry By St. Tropez and Glick Enterprises, Inc.

The Search Warrant issued on the basis of an affidavit of a Special Agent of the Federal Bureau of Investigation who had conducted a four month investigation into "possible irregularities of the Federal In-

sured Student Loan Program" in which Lafayette Academy, Inc. was "a lender and participant." The affidavit stated that the affiant had numerous conferences with representatives of the Department of Health, Education and Welfare and had reviewed "in detail" a draft audit report of the Program as administered by Lafayette prepared by auditors of the Office of Education, as well as all of the available support documents used in the preparation of the report "which documents number in the thousands and fill several boxes." The affiant also stated that he had interviewed present and former employees as well as past students, five of whom were named. The affidavit stated that in excess of 22,900 student loans had been made to students of Lafayette Academy in the period from May 17, 1972 to June 30, 1976, totalling approximately $21,280,000.

The Special Agent's affidavit alleged Lafayette Academy, Inc., in the past was "uncooperative" in making records available for government audits, and, stated that he had been advised by a former Director of Instruction of Lafayette that records which were audited had been "screened or doctored" or "altered"; and that in connection with a Federal Trade Commission investigation certain records of students were purged and destroyed. He asserted that student confirmation reports and call reports listing actually enrolled students were inaccurate in that "many students" who had "dropped out" were included, according to an official of the Office of Education.

The affiant specifically asserted that student files—"including student account cards, correspondence files, grade cards, etc."—would establish a withdrawal rate of students in "excess of 42.8%" as determined by Office of Education auditors which, in accord with 45 C.F.R. § 177.66 (1977), requires an audit if the rate exceeds 20%. It is further stated that with a dropout rate in excess of 42.8%, and in view of the deliberate withholding of records, Lafayette "could have withheld a large number of refunds fraudulently in violation of 45 C.F.R. § 177.63."

The affidavit also stated that material data establishing excess payments of interest and falsification of data forwarded to the Government, in violation of 18 U.S.C. § 1001 (False and Fraudulent Statements) was stored on the premises on tapes and/or discs, and, that microfilmed records of students grades, account cards, etc. which would show grade cards "as it truly existed at one time" may be stored on the school location at 984 Charles Street.

The Special Agent concluded that Lafayette intentionally submitted fraudulent records to the Office of Education and that Lafayette's officials intentionally engaged in fraudulent practices against the Government. The affidavit enumerated a list of 26 categories of documents which "constitute evidence of violations of the laws of the United States, 18 U.S.C., § 286, 287, 371, 1001 and 1014." (Appendix A is a copy of the 26 categories, as set forth in the Affidavit.)

The property to be seized, according to the warrant was:

"books, papers, rosters of students, letters, correspondence, documents, memoranda, contracts, agreements, ledgers, work sheets, books of accounts, student files, file jackets and contents, computer tapes/discs, computer operation manuals, computer tape logs, computer tape layouts, computer tape printouts, Office of Education (HEW) documents and forms, cancellation reports and directives, reinstatement reports or forms, Government loan registers, refund ledgers, reports and notes, administrative reports, financial data cards, lesson and grading cards and registers, registration (corporations), journals of accounts and student survey data, which are and constitute evidence of the commission of violations of the laws of the United States, that is violations of 18 U.S.C., Sections 286, 287, 371, 1001 and 1014."

Movants have filed extensive affidavits in support of their motions which in detail attempt to contradict the agent's affidavit in support of the application for the search warrant. They further describe in detail the nature of the search and seizure and

allege that certain microfilm records kept by Erwin Stein, a corporate officer, at his home were obtained as a result of a threat by F.B.I. agents to "ransack" the Stein home.

The motions were heard on July 28, 1978 and September 5 and 6, 1978. At the first hearing the Court made it clear that based on the affidavits, it would order an evidentiary hearing, if requested. Movants elected to proceed to oral argument (Tr. pp. 11–12). At the second hearing, the Government went forward with evidence on the issue of whether or not Erwin Stein had voluntarily consented to deliver the microfilm records kept at his home, and on that issue alone. (Tr. pp. 8, 9, 15).

At the September 6, 1978 hearing, on cross-examination the evidence established that the search warrant was executed by approximately 30 Government agents, who employed four trucks to remove the documents seized, including 100 to 110 file cabinets, 50 to 60 temporary files—and a couple of hundred boxes of loose files. This evidence was introduced solely to show Mr. Stein's state of mind prior to his consent to deliver microfilm records at home. (Tr. pp. 60–62).

Two circumstances in this matter must be addressed in order to view it in its appropriate perspective. First, the movants presented no evidence with respect to their contention. The only evidence was presented by the Government and limited to the issue of the voluntary nature of the actions of Mr. Stein, who delivered certain microfilms of records some miles distant from the site of the search for and seizure of documents. Second, although the affidavit in support of the search warrant states 25 specific categories of records and one described as books, papers and memoranda which relate to the other 25 categories, as evidence of violations of Title 18, United States Code, §§ 286, 287, 371, 1001 and 1014, the property to be seized in the search warrant is described, in many instances, in different terms, and categories of items were added which were not referred to in the affidavit. Further, the F.B.I. Inventory

Record, incorporated in the return of the search warrant and consisting of 43 pages, lists items which are not referred to either in the affidavit or the warrant.

The Court is left with the task of unraveling a very tangled situation.

The initial inquiry is the application of Amendment IV of the Constitution in terms of (1) was there probable cause to issue the warrant; (2) was there an unreasonable search and seizure; and, (3) were the place to be searched and the things to be seized particularly described?

■ The requirement of probable cause is satisfied if the affidavit provides information either personally acquired or reliably communicated upon which a person of reasonable caution is warranted in believing that an offense has been or is being committed. It is not necessary to prima facie establish illegality. *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1968). However, mere suspicion is not sufficient. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933).

■ The fact that difficulty was encountered in obtaining necessary records by the Office of Education; that some records were never made available to the Office of Education; that the majority of records furnished had been "screened" or "doctored" or "purposely altered"; that records had been destroyed in connection with an F.T.C. investigation; that "many students" were listed on Student Confirmation Reports who were ineligible; that the withdrawal rate (the number of enrolled students who did not continue as enrolled students) was in excess of 42.8%; that records were deliberately withheld in order that the true withdrawal rate not be revealed to federal officers; and that Lafayette could have thereby withheld a large number of refunds fraudulently, are adequate to support the affiant's conclusion "that the officials of the school have intentionally engaged in fraudulent practices against the Government." The Court therefore finds

that the affidavit sufficiently establishes probable cause for the issuance of a search warrant.

The other two constitutional issues, the reasonableness of the search and seizure and the description of the items to be seized, may be considered together.

█ The evidence establishes that the affidavit in support of the search warrant was not served with the warrant. The scope of the search and seizure must therefore be determined from the warrant itself. Some items according to the inventory record were seized which were not referred to in any manner in the warrant. The search and seizure was clearly unreasonable as to these items taken, which could be suppressed separately. *Andresen v. Maryland,* 427 U.S. 463, Note 11 at 482, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Dunloy,* 584 F.2d 6, 11 at Note 4 (2d Cir. 1978). However, items seized outside the scope of the warrant do not constitute the major difficulty in this situation.

A fair reading of the affidavit and warrant establishes the following class of documents within the scope of the warrant:

(1) Items described in the same terms in the affidavit and warrant:

    computer tape layouts

    computer tape printouts

    cancellation reports and directives

    refund ledgers

(2) Apparently similar items described in somewhat different terms (affidavit description in parenthesis)

| WARRANT DESCRIPTION | AFFIDAVIT DESCRIPTION |
| --- | --- |
| Grading cards | (Student grade cards) |
| Roster of students | (Student roster 1969 to present) |
| Student collection reports | (Student account cards) |
| Student files, file jackets | (General student files) |
| Books of account | (General books of account, including cash receipts, disbursements, general journals, corporate ledgers) |
| Financial documents (corporations) | |
| Journals of account | |
| Office of Education documents and forms | (Correspondence files to OE and HEW; to FISL lender banks; to NHSC) |
| Government loan registers | |
| Administrative reports | (Copies of reports to OE and HEW) |
| | (FISL student extension of graduation date forms, 1970 to present) |
| Financial data cards | (FISL student financial cards). |

But in addition, some items are described only in the warrant and not in the affidavit:

    computer tapes/discs

    computer operation manuals

    computer tape logs

    reinstatement reports or forms

    reports and notes

    lesson cards

    registers

    registration (corporations) documents

    student survey data.

Further, the warrant refers to "books, papers, rosters of students, letters, correspondence, documents, memoranda, contracts, agreements, ledgers, work sheets . . . ." which constituted evidence of offenses. The affidavit refers only to books, papers, rosters and memoranda in arguably equivalent categorization to relate to the twenty-five categories of documents to be seized.

At least those classes of documentary material described in similar terms in the affidavit and warrant [category (2) above] are sufficiently specific that they might, in the opinion of this Court, if standing alone and sufficiently limited as to time, be proper demands. But the warrant, considered as a whole, contains still other aspects of generality. Certainly, "Books, papers, . . . letters, correspondence, memoranda, contracts, agreements, reports and notes . . . which are and constitute evidence of violation of the Constitution of the United States, that is violation of 18 U.S.C. § 286, 287, 371, 1001, and 1014" are general in nature and purport to allow a general rummaging through and seizure of any piece of paper in the possession of movants. The general nature of the demand is especially obvious when it is considered that there are no time limitations stated in the warrant. At oral argument, the Government conceded that the search warrant was not limited either in terms of time or subject matter. (July 28, 1978, Tr. p. 54). It conceded that "I can't argue with that, Judge, because you have to take what it reads."

The issue is the effect of this partial invalidity and whether or not the Court may excise or sever the invalid warrant demands. Both *Andresen, supra*, and *Dunloy, supra*, relate to items outside the scope of the warrant and not to described items within the scope of an otherwise broad and general warrant. The position on this issue in this Circuit is to invalidate the whole.

Thus, in *United States v. Nine 200-Barrel Tanks (Approximately Full) Of Beer*, 6 F.2d 401 (D.R.I.1925), an entire brewery, including real estate, fixtures, and movable property described as "the usual machinery, apparatus, and equipment," was seized. The court, in part, stated:

> Where the illegality was such as to affect the whole proceedings, or all or a large portion of the property seized, the whole transaction will be held invalid. *Id.* at 402.

*See also, Giles v. United States*, 284 F. 208 (1st Cir. 1922). *Accord, United States v. Burch*, 432 F.Supp. 961 (D.Del.1977).

A line of authority does permit limited severability. *See Aday v. Superior Court of Alameda County*, 55 Cal.2d 789, 13 Cal.Rptr. 415, 362 P.2d 47 (1961); *United States v. Ketterman*, 276 A.2d 243 (D.C.C.A.1971); and *People v. Hansen*, 38 N.Y.2d 17, 377 N.Y.S.2d 461, 339 N.E.2d 873 (1975). However, even California courts have not followed *Aday*. *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1975); *Lockridge v. Superior Court of Los Angeles County*, 3 Cal.3d 166, 89 Cal.Rptr. 731, 474 P.2d 683 (1970).

The Court could be tempted to seek to save from constitutional condemnation so much of the seizure as is possible. The National Student Loan Program is one vehicle employed by the Government to provide those who seek higher education with a portion of the means to do so. It is significant in terms of public support that this program function efficiently and honestly. The benefits of the program to the future of so many young people and to the nation are all too obvious. It is essential that this nation not only construct barriers in the interest of defense but at least as important is the need to affirmatively attack ignorance. However, laudable objectives, no matter how justified, cannot be permitted to blunt the clear mandate of the Fourth Amendment spawned by the experience of our forebearers with tyrannical invasions of despots.

There are instances, stated above, in which courts have excised the offending items and sustained search warrants as to portions of items seized. The best that can be said of those cases in these circumstances is that they represent a limited exception to the universal invalidity of general warrants. No authority approaches the major drastic corrective surgery which would be the burden of this Court in an effort to cure the constitutional maladies from which this warrant suffers. The warrant apparently encompasses all documents in the movants' possession without limitation as to time or purpose. Indeed, the Government concedes that it was unwilling to apply the time or effort required at the movants' place of business to separate out those items which the government considered to be evidence of crime. Counsel for the Government stated: "if we were to in fact sit down at Lafayette on the day of the search and go through each piece of paper to establish whether or not it is evidence of a crime, we'd still be there." (July 28, 1978, Tr. p. 55). This statement was made ten months after the seizure. Further, the attorney who made it was the attorney who drew the search warrant and in fact was present and participated in the actual seizure.

■ A great deal of time and effort has been applied by the Government to what it considers may be a massive fraud. It may be that the Government is correct. This possibility however, does not permit this Court to rewrite the Constitution. Fourth Amendment protections encompass corporations and their papers. *Hale v. Henkel*, 201 U.S. 43, 76–77, 26 S.Ct. 370, 50 L.Ed. 652 (1906). Either the Fourth Amendment applies literally to this situation or it is of no benefit to any citizen. The Constitution cannot be selectively applied.

■ The Court, therefore, holds that the search warrant in issue in this proceeding is constitutionally invalid as unreasonable in its scope. *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Furthermore, the particularity of description required by the Fourth Amendment is lacking. *Montilla Records of Puerto Rico, Inc. v. Morales*, 575 F.2d 324 (1st Cir. 1978); *United States v. Klein*, 565 F.2d 183 (1st Cir. 1977).

Rule 41(e) of the Rules of Criminal Procedure provides that if these motions are granted, the seized documents shall not be admissible in evidence at any hearing or trial. In view of the self-executing provisions of Rule 41(e), the further relief sought by the movants is unnecessary.

There remains the issue of the validity of the Government's continued possession of microfilm delivered by movants' chief executive officer at his home. The issue here is whether in view of an illegal search and seizure, documents delivered voluntarily may be retained.

■ In order to determine whether or not property delivered in connection with an invalid search may be retained, it is necessary that the Court analyze the evidence considering the totality of the factors involved. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The invalidity of the initial search does not automatically invalidate whatever else may have been otherwise produced. *United States v. Hall*, 565 F.2d 917 (5th Cir. 1978); *United States v. Watson*, 504 F.2d 849 (9th Cir. 1974); *Leavitt v. Howard*, 462 F.2d 992 (1st Cir. 1972).

■ The Court must be impressed with the failure of the movants to provide testimony from the witness who is best qualified to testify concerning the alleged effect of the search ostensibly authorized by the invalid warrant upon the free will of the custodian of the microfilm records. It must be assumed that his absence from the witness stand was a decision deliberately made because his testimony could not help the movants' contentions. It cannot be that this testimony was not presented because of the risk of self-incrimination since no such risk was present. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967). It must be concluded that the witness was not prepared to appear in Court and to give testimony verifying the colorful and wide ranging allegations of his previously filed affidavit. It must be concluded that the witness knew exactly what he was doing when upon request of an agent of the F.B.I. he drove in his own automobile alone to his home and there handed over the microfilm in his possession. This is not to shift the burden of proof on this aspect of the matter, since that remains with the Government throughout, but to recognize the fact that the Government has presented consistent and thoroughly believable proof that the absent witness did exactly what one would expect of the chief executive of an educational institution. The lack of evidence of involuntariness merely buttresses what is already an overwhelming demonstration of voluntariness by the Government.

Further, if the Government had obtained a separate warrant for its search of the Stein home, that warrant would not be rendered invalid by the fate of the warrant for the North Providence premises. In *Leavitt, supra,* at 998 the Court reasoned:

> If the police have over-reached and obtained oral admissions, they have received something they otherwise would not have. As to a search, on the other hand, if the only result of the apparent consent is a premature search, suppressing the evidence because of police reliance on a faulty consent has the effect of suppressing for all time what, but for misplaced reliance upon an apparent consent, the police would have been entitled to later.

Accordingly, movants' Motions for return of property are granted, except with respect to microfilm records delivered to the Government by Mr. Stein from his home.

SO ORDERED.

774

CATEGORIES SET FORTH IN
THE AFFIDAVIT

1. Records of student financial accounts
2. Student applications
3. Student account cards
4. Student grade cards
5. Student correspondence files
6. General student files
7. Correspondence files to OE and HEW; to FISL lender banks; to NHSC
8. Student roster 1969 to present
9. Financial statements of Lafayette
10. General books of account, including cash receipts, disbursements, general journals, corporate ledgers
11. Notes receivable and notes payable
12. Instructors' grade books
13. Savings accounts of Lafayette
14. Printouts on FISL transactions
15. List of refunds to students
16. FISL student financial cards
17. Contracts with FISL lender banks
18. Copies of reports to OE and HEW
19. FISL student extension of graduation date forms, 1970 to present
20. FISL loans paid off by Lafayette
21. Student complaint memos
22. Computer tapes and microfilms
23. Computer tape layouts and computer tape printouts
24. Cancellation reports and directives
25. Refund ledgers
26. Books, papers, memoranda, which may relate to the above requested documents.