UNITED STATES of America

v.

Mary Sue HUBBARD et al.

Crim. No. 78–0401.

United States District Court,
District of Columbia.

Sept. 13, 1979.

Carl S. Rauh, U. S. Atty., Raymond Banoun, Judith Hetherton, Timothy J. Reardon, Steven C. Tabackman, Asst. U. S. Attys., Washington, D. C., for the United States.

Leonard B. Boudin, Rabinowitz, Boudin & Standard, Michael Lee Hertzberg, New York City, for defendant Hubbard.

Philip J. Hirschkop, John D. Grad, Leonard S. Rubenstein, Hirschkop & Grad, P. C., Alexandria, Va., for defendants Heldt and Snider.

Roger E. Zuckerman, Roger C. Spaeder, Lawrence A. Katz, Richard A. Stanley, Wendy K. Manz, Zuckerman, Spaeder & Taylor, Washington, D. C., for defendants Willardson and Weigand.

Michael Nussbaum, James Davenport, Ronald G. Precup, Nussbaum & Owen, Washington, D. C., for defendants Hermann and Raymond.

John Kenneth Zwerling, Jonathan Shapiro, Zwerling & Shapiro, Alexandria, Va., for defendant Wolfe.

Leonard Koenick, Washington, D. C., for defendant Thomas.

MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

The fourth amendment of the U. S. Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S.Const. Am. 4. This amendment was intended to prevent searches under unchecked general authority, such as those that had resulted from the use of the general warrant in England and the writs of assistance in the Colonies, and to ensure the "privacies of life". *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *See Stanford v. Texas,* 379 U.S. 476, 481–85, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Frank v. Maryland,* 359 U.S. 360, 363–65, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959).

The exclusionary rule is a judicially created means of effectuating fourth amendment rights. *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court held that a defendant could petition prior to trial for the return of illegally seized evidence, and in *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), the Court held that such evidence could not be introduced in a federal prosecution. Although the exclusion of probative reliable evidence denigrates the public interest in the determination of the truth at trial, the exclusionary rule has evolved as one deterrent to police misconduct. *Stone v. Powell,* 428 U.S. 465, 487–88, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).[1]

Before the Court at this time are the motions of the defendants to suppress evidence. Finding no illegality in the actions of the government agents who executed the warrants at issue, the Court will deny the motions, and order the defendants to proceed to trial to be "acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman v. United States,* 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969).

## I. PROCEDURAL HISTORY

On July 8, 1977, three search warrants were simultaneously executed on premises owned and operated by the Church[2] of Scientology: 2125 S Street, N. W., Washington, D. C.; 5930 West Franklin Avenue, Hollywood, California [the Fifield Manor]; and 4833 Fountain Avenue, Hollywood, California [the Cedars-Sinai Complex]. Immediately following the execution of the warrants, the Church filed two separate actions in Los Angeles and the District of Columbia seeking the return and suppression of property pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure.[3]

Of course, other remedies, such as civil damage suits, are available for fourth amendment violations by federal officers. *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

---

1. Where the deterrent effect is outweighed by the public interest in the integrity of the truth-finding process the Supreme Court has abolished or refused to extend the exclusionary rule. *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (where state has provided full and fair litigation of fourth amendment claim, state prisoner could not be granted habeas corpus relief on grounds that evidence obtained through unconstitutional search and seizure was introduced at trial); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (refusal to extend the exclusionary rule to grand jury proceedings); *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (government permitted to use unlawfully seized evidence to impeach a defendant who testified broadly at trial).

2. The Court will assume for the purposes of this action that the Church of Scientology is a bona fide religious organization.

3. Rule 41(e) of the Federal Rules of Criminal Procedure provides:

A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized. The

On July 27, 1977, Chief Judge Bryant of this Court ruled that the warrant executed in the District of Columbia was invalid on its face. *In re: Search Warrant Dated July 4, 1977*, 436 F.Supp. 689 (D.D.C.1977). On December 1, 1977, the United States Court of Appeals for the District of Columbia Circuit reversed Judge Bryant's decision and upheld the validity of the District of Columbia search warrant. *In re: Search Warrant Dated July 4, 1977*, 187 U.S.App. D.C. 297, 572 F.2d 321 (D.C.Cir. 1977), *cert. denied, Founding Church of Scientology v. U. S.*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978).

In separate Memorandum Opinions of April 4, 1978, and July 5, 1978, Judge Lucas upheld the execution of the warrants in California on all grounds. *Church of Scientology v. United States*, No. CV–77–2565– MML (C.D.Cal. April 4, 1978); *Church of Scientology v. United States*, No. CV–77– 2565–MML (C.D.Cal. July 5, 1978). On February 22, 1979, the Ninth Circuit Court of Appeals dismissed the Church's appeal of Judge Lucas' decision on the ground that the judgment was interlocutory and unappealable. *Church of Scientology v. United States*, 591 F.2d 533 (9th Cir. 1979).

Meanwhile, on August 15, 1978, eleven individuals were indicted by a federal Grand Jury.[4] It is these individuals,[5] about to go on trial, who are before this Court seeking to suppress the evidence seized on July 8, 1977. The suppression hearing began on July 3, 1979, with this Judge taking testimony in Los Angeles, California,[6] and ended, following a view of the premises and several weeks of proceedings in Washington, D. C., on August 29, 1979.

Five days prior to the completion of the hearing on the defendants' motions to suppress, Chief Judge Bryant issued an eleven-page Memorandum and Order holding that the search conducted in Washington, D. C. violated the fourth amendment. *In re: Search Warrant Dated July 4, 1977*, Misc. No. 77–0151 (D.D.C. August 24, 1979).[7] It has been the government's position throughout the litigation before this Court, that none of the documents seized at the District of Columbia location were shown to the Grand Jury which indicted the defendants, and that none would be used at the trial in this case. Thus, the propriety of the District of Columbia search is not an issue before this Court.[8] Accordingly, before this Court is the motion, filed by the nine individuals about to go on trial, to suppress the evidence seized on July 8, 1977, from the two Church of Scientology premises in Los Angeles, California.

The defendants have raised six broad grounds in support of their motion to suppress:

judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

**4.** For background as to the nature of the charges see the Court's Memorandum Opinion of April 25, 1979. *United States v. Hubbard*, 474 F.Supp. 64 (D.D.C.1979).

**5.** Only nine of the defendants are before the Court. Two are awaiting extradition proceedings in Great Britain.

**6.** The defendants consented to the taking of testimony outside the jurisdiction for use in the suppression hearing for the convenience of the witnesses. Trans. of July 4, 1979, at 5–17.

**7.** On August 27, 1979, the Court withdrew the last three pages of its Memorandum and Order and substituted three new pages. *In re Search Warrant Dated July 4, 1977*, Misc. No. 77–0151 (D.D.C. August 27, 1979). The substance of the Court's ruling was not affected.

**8.** The defendants also moved for the suppression of evidence seized by the United States Customs Service on July 3, 1976. After assurances from the government that none of the evidence seized in that search will play any role in the prosecution of this case, the defendants abandoned that motion. Trans. of August 29, 1979, at 410. The government's concession was not made from a position of weakness: In *Church of Scientology v. Simon*, 460 F.Supp. 56 (C.D.Cal.1978), *aff'd*, 441 U.S. 938, 99 S.Ct. 2153, 60 L.Ed.2d 1040 (1979) the challenged search was upheld.

1. The warrant was unconstitutional on its face because it is not supported by probable cause, was based upon stale information, did not particularly describe the place to be searched and the items to be seized, and was a general warrant;

2. The search was illegal because the affidavit which was necessary to uphold the legality of the warrant was not attached to the warrant at the time it was executed;

3. The agents conducted a general, exploratory search, in violation of the terms of the warrant and of the first and fourth amendments;

4. The agents seized documents beyond the scope of the warrant;

5. The agents used excessive force in their searches in violation of 18 U.S.C. § 3109; and,

6. The warrant was obtained and executed by the government in a manner which violated defendants' right to process of law.

The government has convincingly undermined the persuasiveness of the defendants' arguments on three broad grounds. First, the government contends that the standing of the defendants to seek the suppression of evidence seized from the premises of the Church is severely limited. Second, the government points to the decision of the U. S. Court of Appeals for the District of Columbia upholding the facial validity of the search warrant, *In re: Search Warrant Dated July 4, 1977, supra,* and the decisions of Judge Lucas upholding its execution in Los Angeles. *Church of Scientology v. United States, supra.* Finally, the government seeks to narrow the inquiry to the documents the government intends to introduce into evidence as part of its case-in-chief, which the defendants virtually concede were properly seized. The Court will begin its inquiry with an analysis of the defendants' right to challenge the search of the Church's premises.

## II. THE DEFENDANTS' FOURTH AMENDMENT RIGHTS ARE LIMITED TO THEIR OWN OFFICES.

Traditionally, it was necessary for a defendant to demonstrate "standing" before he or she could challenge the validity of a search. *See Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court subsumed the traditional standing inquiry under substantive fourth amendment doctrine. *Id.* 99 S.Ct. at 428. Thus, defendants can have illegally seized evidence suppressed if their fourth amendment rights have been infringed. *Id.*

In the prior proceedings at which the searches were challenged, the searches plainly involved the plaintiff's fourth amendment rights: the Church of Scientology was the owner and operator of the premises and the party challenging the searches. In the proceedings before the Court, the parties challenging the searches are individuals.

Each individual defendant in a criminal case must demonstrate that his or her fourth amendment rights are involved in order to suppress evidence. In *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court noted that:

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.

*Id.* at 171–72, 89 S.Ct. at 965.

An individual's fourth amendment rights are involved if he or she has "a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois, supra,* 99 S.Ct. at 430. It has been recognized that such a test does not provide a "bright line" between cases, but instead, each case must be determined on the facts and circumstances presented. *Id.* at 435 (Powell, J., concurring). Accordingly, with respect to each defendant, the Court must make a determination, on the facts and circumstances

presented by that defendant, whether they had a legitimate expectation of privacy in the area from which evidence was seized.

In the Fifield Manor, evidence was seized from the offices of the defendants Duke Snider and Henning Heldt. In the Cedars-Sinai Complex, the only defendants' offices from which evidence was seized were those of Cindy Raymond and Greg Willardson. The government concedes that Heldt, Snider, Raymond, and Willardson have standing to suppress evidence seized from their own offices.

The defendants contend that every defendant has a legitimate expectation of privacy with respect to both premises in their entirety. In support of this claim, the defendants rely on three independent sources. First, the defendants argue that the places from which the documents were seized were secure offices with limited access. Second, the defendants contend that the documents were purportedly either authored or received by the defendants. Third, the defendants claim that they have an expectation of privacy in the exercise of their first amendment right to association and free exercise of religion.

■ The Court finds that there is a legitimate expectation of privacy with respect to one's own office. In *Mancusi v. De Forte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), union records were seized from an office shared by the defendant and several other union officials. *Id.* at 365, 88 S.Ct. 2120. The parties in *Mancusi* stipulated that the defendant spent a considerable amount of time in the office, and that he had custody of the papers at the moment of the seizure. *Id.* at 368–69, 88 S.Ct. 2120. Accordingly, if documents were illegally seized from an office of one of the defendants, that defendant could prevent the introduction of that evidence to prove his or her guilt.

■ Another of the defendants has attempted to fit within the rule of the *Mancusi* case. The defendant Mary Sue Hubbard has sought to suppress evidence seized from the office of Janet Lawrence because Hubbard is Lawrence's supervisor. The evidence before the Court shows that Hubbard did not even have a key to this office, trans. of August 29, 1979, at 329, and there is no evidence that she ever set foot in it. Accordingly, the Court finds that the defendant Hubbard has no legitimate expectation of privacy in documents located in the office of her assistant.

■ The defendants' second ground is completely unconvincing. According to the defendants, merely because they purportedly authored or were to receive certain letters, they have a legitimate expectation of privacy with respect to the contents of such letters. First, the defendants cannot rely on the government's "purported" allegations or the indictment, but have the burden of asserting a property or possessory interest in the seized property. *Rakas v. Illinois,* 99 S.Ct. 421, 423 n.1 (1978).[9] Having failed to do so, they have failed to meet their burden. Second, even assuming the defendants had established that they received the letters would not decide the issue. The legitimate expectations of privacy of a party who has received letters is obviously affected by what happens to the letters after their arrival. If the letters are kept in the office of the addressee, the addressee would have standing under the rule of the *Mancusi* case. However, if the letters are forwarded to a central filing system, and access to such system is available to numerous third parties, the expectations of privacy would be seriously undermined. Finally, the Court is unable to understand how *sending* letters to a third party would form a basis for a legitimate expectation of privacy after their delivery.[10]

9. In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Court held that testimony given by a defendant in order to establish his standing to object to illegally seized evidence may not be used against him at his trial on the question of guilt or innocence.

10. Of course, had the letter been seized while in the custody of the U. S. Post Office a different issue would be raised. *See Birnbaum v. United States,* 436 F.Supp. 965 (E.D.N.Y.1977).

The reasonableness of one's privacy expectations would certainly be undermined by the act of relinquishing control. *See United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).

■ The defendants' final contention is the vague and general argument that they had an expectation of privacy in the exercise of their first amendment right to association and free exercise of religion. In effect, the defendants seek to raise the rights of third parties simply because they share membership in a religious organization. In *Rakas,* the Supreme Court explicitly and emphatically declared that fourth amendment rights are personal and cannot be raised vicariously. *See Rakas v. Illinois,* 99 S.Ct. 421, 425 (1978). Mere membership in a religious organization would not result in the "[l]egitimation of expectations of privacy . . . by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.* at 430 n.12. For example, there is no evidence that the defendant Wolfe ever set foot in any of the Church's offices in California, and no evidence that he was even aware of the existence of the documents seized on July 8, 1977. The Court is unable to fathom how he could have any expectation of privacy with respect to documents and premises merely because of his membership in the Church. Being an official of the Church would not alter this analysis. The defendants seek a significant broadening of the right to suppress evidence. This attempt must be rejected. The Court is unconvinced that such an enlargement in the class of those who can invoke the exclusionary rule would benefit the effectuation of fourth amendment goals. *See Rakas v. Illinois,* 99 S.Ct. 421, 427 (1978). Accordingly, only the defendants Heldt, Snider, Willardson, and Raymond have fourth amendment rights touched by the searches of July 8, 1977, and their rights are limited to evidence seized from their offices which is being introduced against them.

## III. THE WARRANTS ARE FACIALLY VALID.

Each warrant at issue in this case included a description of the premises, a description of property to be seized with 162 items, a source of documents indicating the source of the first 147 items to be seized, and an affidavit in support of the search warrant. The defendants contend that the information relied on by the affiant is unreliable, and the warrants were not supported by probable cause, do not particularly describe the places or things to be seized, and are based on stale information.

Each of the warrants executed on July 8, 1977, was supported by the same thirty-five page affidavit in support of the search warrant. The affidavits are identical except that typographical errors in the District of Columbia affidavit were corrected in the Los Angeles affidavits, and two additional footnotes were added to the two Los Angeles affidavits. The Court's analysis of the defendants' challenge to the Los Angeles warrants is greatly aided by the decision of the United States Court of Appeals for the District of Columbia Circuit, which reversed Chief Judge Bryant's earlier ruling and upheld the facial validity of the D. C. warrant. *In re Search Warrant Dated July 4, 1977,* 187 U.S.App.D.C. 297, 572 F.2d 321 (D.C.Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978). Of course, such a ruling is controlling precedent.

The affidavit in support of the search warrants details the series of events which led up to the request by the government to search the premises of the Church of Scientology. The following are allegations made in the affidavit:

Michael Meisner and Gerald Wolfe were caught in areas off-limits to the public in the United States Courthouse in the District of Columbia in the spring of 1976. Affidavit in Support of Search Warrant [Aff.] at 15. Both gave phoney names and presented fraudulent Internal Revenue Service [IRS] identification. *Id.* Wolfe pleaded guilty to the false use of a government seal, 18 U.S.C. § 1017, and a warrant was issued for Meisner's arrest. *Id.* at 1–2. On

June 20, 1977, an Assistant United States Attorney received a telephone call and an offer to cooperate from Michael Meisner. *Id.* at 2. Meisner was interrogated in the presence of the affiant over a two-week period at which he described numerous criminal acts committed by himself and others on behalf of the Church of Scientology. *Id.* At seventeen places in the affidavit, the information provided by Meisner was independently verified by the government. *Id.* 2 n.1, 3 n.2, 5 n.4, 6 n.6, 7 n.7, 9 n.10, 11 n.11, 13 n.12 & 13, 14 n.14 & 15, 16 n.16, 19 n.17, 20 n.18, 27 n.21. Meisner was a high official of the Guardian's Office, the office in the Church responsible for the "protection" of Scientology. *Id.* at 3–4. One of the five Bureaus of the Guardian's Office was the Information Bureau which was responsible for illegal operations to acquire government documents critical of Scientology, covert operations to discredit and remove from positions of power all persons whom the Church considers to be its enemies, and internal security within the Church. *Id.* at 3. Meisner was Assistant Guardian for Information for the District of Columbia, *id.* at 4, and later National Secretary in Los Angeles, *id.* at 21, and as such had access to the most sensitive Church documents, including those kept in the Church's Los Angeles offices. *Id.* at 4. No immunity was offered Meisner for his testimony. *Id.* at 21 n.20.

The affidavit goes on to detail the conspiracies to steal government property and to obstruct justice. Beginning in early 1974, Guardian World Wide Jane Kember issued Guardian Order [GO] 1361, which called for an all-out attack on the IRS including infiltration of the offices of the IRS by agents of the Church. *Id.* at 4–5. Cindy Raymond, a member of the staff of the Deputy Guardian for Information, Mitchell Hermann, who was then responsible for covert activities in the District of Columbia, and Meisner recruited Gerald Wolfe for the purpose of infiltrating the IRS. *Id.* at 5. However, their plans were thwarted by Wolfe's inability to obtain all of the documents desired by his superiors. *Id.* at 5. In order to complete their plans

covert entries were made by Meisner, Hermann, or Wolfe into IRS and Justice Department buildings on numerous occasions. *Id.* at 5–7. Furthermore, an electronic listening device was placed in an office which was used for high-level IRS meetings. *Id.* at 5 n.4.

In December, 1975, Cindy Raymond developed a "program" calling for covert operations designed to obtain Interpol documents regarding the Church of Scientology contained in files held by government agencies. *Id.* at 7–8. This program was developed in response to the general directive contained in GO 1634 which sought to obtain all documents that were not disclosed pursuant to the Freedom of Information Act, 5 U.S.C. § 552. *Id.* at 8. According to this program agents were to be placed in government offices, and thefts were to be made. *Id.*

Pursuant to these programs and orders, offices of the Department of Justice, the United States Attorney for the District of Columbia, and the IRS were entered on numerous occasions by Wolfe and Meisner. *Id.* at 5–9. Furthermore, Sharon Thomas, a member of the Church, was placed in a secretarial position within the Justice Department in order to assist in these thefts. *Id.* at 8–9.

When documents were obtained from certain of these incursions, Meisner sent copies to the Los Angeles Guardian's Office where copies were distributed to Guardian's Office officials, including Henning Heldt, and Richard Weigand. *Id.* at 6. These were marked "Confidential GO 1361 Material". *Id.* Other documents obtained illegally were sent by Meisner or Hermann to their superiors with cover memos explaining their contents signed "Mike" or "Mitch". *Id.* at 12, 22.

After Meisner and Wolfe were confronted in the Courthouse, the obstruction-of-justice conspiracy began. *Id.* at 15. Plans were made to limit the government's inquiry into the entry. *Id.* at 16–17. Included in this cover-up plan was the concoction of a false story Wolfe would present to the

grand jury. *Id.* at 19–20. Eventually, Meisner became dissatisfied with his treatment at the hands of the Church officials, escaped from the guard placed on him by the Church, and agreed to cooperate in the ongoing government investigation. *Id.* at 21.

Meisner also provided the affiant with detailed information on the filing system of the Church. *Id.* at 22. The primary depository for documents was the Information Bureau in Los Angeles. *Id.* Documents obtained through legitimate channels were marked "FOI" and those obtained through burglary or theft were marked "Non-FOI". Nowhere in the affidavit does it state, or even suggest, that these filing cabinets were the only places where documents named in the warrant could be found.

The files and their locations are described in some detail. *Id.* at 23–24. The Information Bureau documents were divided into six file systems. *Id.* at 23. The main Information Bureau files were made up of two file systems—individual and group—totaling 250 file cabinets. *Id.* The government special bank contained government documents, the majority of which were "Non-FOI" in ten filing cabinets of four or five drawers each. *Id.* The individual, group and government special bank files were located in the Information Bureau's Offices in Cedars. *Id.* at 28. The program files were located in the Heldt suite. *Id.* at 30. The operations files were kept in the offices of the National Operations Officer, *id.* at 23, which was in Cedars. *Id.* at 29. The confidential file of the Deputy Guardian for Information (U.S.) was kept in the safe and a file cabinet in the office of the Deputy Guardian for Information, Greg Willardson, at Cedars. *Id.* at 24.

### A. The Warrants Are Supported By Probable Cause.

■ The defendants' first contention is that the warrants lack probable cause because the informant was unreliable. Meisner gave information in direct conflict with his penal interest, without any promises by the government, and his information was independently corroborated in numerous respects. As a former official of the Church, Meisner had direct knowledge of the operations of the Information Bureau and the location of its offices and files. The affidavit showed that the information was sufficiently reliable.

■ The defendants' second contention is that the 162 items in the "Description of Property", which is attached to the warrants, are not supported by probable cause. Items 1–99 are described in the source of documents as those taken from the office of an Assistant United States Attorney in Washington, D. C., and a footnote to the affidavit indicates that Meisner reviewed this Assistant's files and identified the documents in items 1–99 as those taken. *Id.* at 13 n.*. The affidavit further states that Meisner sent copies of these documents to his superiors in Los Angeles. *Id.* at 12.

Items 100–148 are documents taken by Sharon Thomas from the office of a Department of Justice attorney and were identified as such by Meisner. *Id.* at 9 n.10. Furthermore, the affidavit indicates that copies were sent by Meisner to his superiors in Los Angeles. *Id.* at 6.

Items 149–151 concern synopses of Wolfe's grand jury testimony, notes by Weigand relating to the Wolfe and Meisner illegal entry into the Courthouse, and reports by Meisner about their entry. The affidavit indicates that these materials were prepared in order to cover up the Church's role in the break-in, and were delivered to Weigand, who took them to Heldt. *Id.* at 17.

Item 152 called for the seizure of Guardian Order 1361 which called for the infiltration of the IRS by agents of the Church, and the affidavit indicated that such Guardian Order could be located in the Information Bureau's files. *Id.* at 4.

Item 158 is all documents of the IRS which relate to the Church marked "Confidential GO 1361 Material." The affidavit made clear that such material was obtained as a result of the burglaries of the IRS offices, and was sent to and seen at the

Information Bureau in Los Angeles. *Id.* at 6.

Items 153 and 154 concern Guardian Order 1634 and all Guardian Orders issued pursuant to Guardian Order 1634 which would be identified as Guardian Order 1634–(number). The affidavit indicates that these orders related to the obtaining of government documents which the government refused to release under the FOIA. *Id.* at 7–8.

Items 155 and 156 called for the seizure of all Guardian Orders identified as "Snow White" and those issued pursuant to "Snow White," which would be identified by the mention of "Snow White." The affidavit indicates that this program was directed against the government. *Id.* at 24. Furthermore, the Court of Appeals expressly found probable cause for the seizure of such items. *In re: Search Warrant Dated July 4, 1977, supra* 187 U.S.App.D.C. at 303, 572 F.2d at 327.

Item 157 is all documents in the Operations files concerning Robert Snyder. The affidavit indicates that illegal operations were directed against this individual who is identified as a newscaster critical of the Church. Aff. at 10.

Items 159 and 160 call for the seizure of all documents attached to a memorandum from Hermann or Meisner signed "Mitch" or "Mike." The affidavit establishes that such memoranda were sent to officials of the Guardians Office with stolen government documents attached. *Id.* at 9, 12.

Item 161 concerns all documents marked Non-FOI. The affidavit indicates that such documents are the result of burglary and theft. *Id.* at 22.

Finally, item 162 calls for the seizure of "any and all fruits, instrumentalities, and evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government property in violation of 18 U.S.Code §§ 371, 1503 and 641 which facts recited in the accompanying affidavit make out." The Court of Appeals expressly upheld the validity of this clause under the authority of *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). *In re: Search Warrant Dated July 4, 1977, supra* 187 U.S.App.D.C. at 303–304, 572 F.2d at 327–28.

The defendants also contend that the warrants lacked probable cause because the information in the affidavit was stale. With respect to both Los Angeles locations, the affidavit indicates that Meisner was a trusted member of the Information Bureau; that he was told by other Information Bureau officials where files were located; that such documents were kept as a part of the Church's desire to maintain a permanent history for the Church; that such documents were essential to the operations of the Information Bureau; and that he personally watched many Information Bureau officials locate and retrieve files. Meisner confirmed his information merely twenty-eight days before the search warrants were approved by the magistrate. Aff. at 28–29. Plainly, the information was not stale. Moreover, where documents are concerned, the doctrine of staleness has a limited role. Unlike consumable or disposable items it is reasonable to expect that documents will be maintained. *See Andresen v. Maryland,* 427 U.S. 463, 478–79, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

Finally, the defendants contend that the warrant failed to indicate where documents were to be seized. The warrant for the Cedars-Sinai Complex specified the Information Bureau where most of the files and offices were located. The warrant for Fifield Manor specified the sixth-floor suite of Henning Heldt where copies of the program files were located and numerous documents were sent. Aff. at 7 n.7, 17, 18, 29–30. Furthermore, both warrants gave general directions as to where the offices would be located based on information from the informant.

Accordingly, the Court finds that the government submitted to the magistrate extremely detailed and elaborate support for the search warrants in this case, and such support was sufficient as a matter of law.

## IV. THE AFFIDAVIT WAS AVAILABLE TO THE SEARCHING AGENTS AND TO OFFICIALS OF THE CHURCH.

■ The defendants contend that the searches were invalid because the affidavit in support of the warrant was "unavailable for guidance for the executing agents . . . ." Motion to Suppress at 57 (January 15, 1979). The defendants' contention is unsupported by the evidence. No less than fourteen witnesses before the Court directly disputed the defendants' claim.[13] Affidavits were available for the searching agents.

■ The defendants also contend that the searches were illegal because the Church officials were served with only the warrant and not the affidavit. Evidence at the hearing indicated that Church representatives were told that the Magistrate had placed the affidavit under seal. Trans. of July 9, 1979 at 217 (testimony of Barry Weissman). Furthermore, representatives of the Church obtained copies of the affidavit at the Courthouse by 10 A.M. on the morning of the search. Trans. of July 11, 1979 at 214 (testimony of Luther Shaffer). Moreover, failure to serve even the warrant is merely a ministerial violation of Rule 41(d) of the Federal Rules of Criminal Procedure and would not render the search fatally defective. *See United States v. Klapholz*, 17 F.R.D. 18 (D.C.N.Y.1955), *aff'd*, 230 F.2d 494 (2d Cir. 1956), *cert. denied*, 351 U.S. 924, 76 S.Ct. 781, 100 L.Ed. 1454 (1956). Accordingly, the searches are not in violation of law on the ground that the affidavit was not served along with the warrant.

## V. THE AGENTS DID NOT USE EXCESSIVE FORCE IN THE COURSE OF THE SEARCHES.

■ Section 3109 of 18 U.S.C. provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

### A. *The Cedars-Sinai Complex.*

At the Cedars-Sinai Complex FBI agents appeared at the main gate at 6:00 A.M. and the yard was empty. Trans. of August 23, 1979 at 164. The agents rang the buzzer and the night caretaker came outside. *Id.* The agent in charge announced that it was the FBI and they had a warrant to serve. *Id.* The caretaker hesitated and the FBI cut the bolt. *Id.* The agents proceeded inside to the double doors to what ultimately proved to be the Information Bureau which was locked. *Id.* at 166. The buzzer to those doors was pressed and a man from inside opened those doors. *Id.* For the next two hours, the agents tried in vain to have keys supplied to the inner offices. Trans. of July 10, 1979 at 57–62 (testimony of Patricia MacDonald). Initially, a deadline of 7:00 A.M. was set. This deadline was extended to 8:00 A.M. before the forcible entry into the Information Bureau was made. *Id.* at 37, 57–62; Trans. of August 27, 1979 at 235–37.

13. Trans. of August 16, 1979 at 122 (Agent Breen: affidavit on table in room); Trans. of August 16, 1979 at 288 (Agent Oppy: affidavit available on scene); Trans. of August 17, 1979 at 214 (Agent Benavidez: had copy of affidavit with him); Trans. of August 20, 1979 at 101 (Agent Aldridge: copy available to him); Trans. of August 21, 1979 at 20 (Agent Linker: affidavit available in room); Trans. of August 22, 1979 at 55 (Agent Esparza: team leaders throughout area with search warrants and affidavits); Trans. of August 24, 1979 at 42 (Agent Calley: had copy of warrant and affidavit and each team leader had copies available for agents to read); Trans. of August 24, 1979 at 148 (Agent Maryman: team leader had warrant and affidavit); Trans. of August 28, 1979 at 102–03 (Agent Mislock: had copy of affidavit, many agents had copies); Trans. of August 28, 1979 at 210 (former Agent Bauer: searching agents were consulting others with warrant and affidavit); Trans. of August 28, 1979 at 259 (Agent Brunson: had own copy of affidavit); Trans. of July 20, 1979 at 6002 (Agent Cleary: Agent Stovall had affidavit and his was available for use by others); Trans. of July 21, 1979 at 6257 (Agent Boone: affidavit right there); and Trans. of July 18, 1979 at 5494 (Agent Stovall: had copy of affidavit).

In the Action Bureau, Church representatives were given until 7:00 A.M. to obtain keys, and all but one door was opened with keys provided by a Church member. Trans. of August 27, 1979 at 93–94.

Finally, in the basement, the agents waited until 8:00 A.M. for keys and then snapped about eight padlocks. Trans. of August 27, 1979 at 104.

### B. *The Fifield Manor.*

Meanwhile at the Manor, the agents arrived at 6:00 A.M., entered the lobby area, identified themselves, and announced their purpose. Trans. of July 20, 1979 at 6002–03. Trans. of July 5, 1979 at 228–29 (testimony of Peter Mead). The agents took the elevator directly to the sixth floor and were confronted by "accordion bars" preventing their exit into the sixth floor. Trans. of July 20, 1979 at 6004. The agents announced their presence, tried to open the gate, and waited one minute and fifteen seconds before cutting the padlock. *Id.* at 6004–05. About six minutes from the time of entry, after an attempt to obtain keys failed, the outer door to the office of Henning Heldt was forcibly opened. *Id.* at 6006–07; Trans. of July 6, 1979 at 62 (testimony of Christopher Ward). From about the time of their entry to the sixth floor, an alarm was sounding. Trans. of July 6, 1979 at 61 (testimony of Christopher Ward).

The refusal of admittance required by section 3109 need not be explicit. *United States v. Allende,* 486 F.2d 1351, 1353 (9th Cir.), *cert. denied,* 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1973). There is no set time an agent must wait for a response, but such time must depend on the circumstances of the case. *United States v. Phelps,* 490 F.2d 644, 647 (9th Cir.), *cert. denied,* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974); *United States v. Allende, supra* at 1353. The nature of an exigency is one circumstance which is to be considered in determining compliance with the statute. *United States v. Agrusa,* 541 F.2d 690, 701 (8th Cir.) *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1976). Where sounds indicating the possible destruction of evidence are heard, the statute need not be complied with. *United States v. Guidry,* 534 F.2d 1220, 1223 (6th Cir. 1976); *United States v. Manning,* 448 F.2d 992, 1001–02 (2d Cir.), (en banc), *cert. denied,* 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971). Essentially the test, under both the statute and the fourth amendment, is one of reasonableness—as to both the entry itself and the scope of the force exercised in order to complete that entry. *See United States v. Murrie,* 534 F.2d 695, 698 (6th Cir. 1976); *United States v. Fernandez,* 430 F.Supp. 794, 800 (N.D.Cal.1976).

Applying the law to the facts of this case, the Court finds that the agents complied with the requirements of section 3109. In the Cedars-Sinai Complex, the front gate bolt was not clipped until the night caretaker hesitated in his progress towards opening the gate. Based upon the nature of the charges in the warrant and affidavit and the sophistication of the organization shown in these same documents, it was reasonable for the agents to fear that an alarm could have been or was about to be set off which would trigger the destruction of evidence. After the initial entry, the agents illustrated remarkable patience, as all of the other locks and doors in the Cedars-Sinai Complex remained intact for at least an hour. Forcible entry was not made until Church representatives refused to permit entry.

In the Fifield Manor, the time prior to entry was considerably less. However, the agents had more concrete evidence that a system signaling the destruction of evidence may have been activated: an alarm sounded upon their entry to the sixth floor. Under such exigent circumstances, even silence can be taken as a refusal to permit entry. In this case, however, there was more. The representatives on the scene had already indicated to the agents that they did not have keys. Therefore, the explicit requirements of the statute were met. Under the circumstances of this case, their actions were entirely reasonable.

The Court finds that the agents used reasonable force in opening doors and locks. Minimization was attempted: the use of

electric drills was attempted instead of sledgehammers, but the drill bits snapped. Trans. of August 23, 1979 at 37, 53.

The Court finds that the agents conducting the searches in California complied with section 3109 and the fourth amendment. The behavior of the agents was eminently reasonable with respect to the timing and scope of their forcible entries—including outside doors, inside doors, filing cabinets, and desks. No excessive damage was inflicted.

## VI. CHURCH PERSONNEL WERE ALLOWED TO OBSERVE THE SEARCH.

■ Rule 41(d) of the Federal Rules of Criminal Procedure requires that an inventory of the seized property be made in the presence of applicant for the warrant and the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person. At the Fifield Manor location, representatives of the Church were allowed to observe the agents searching and making the inventory. Trans. of July 6, 1979 at 323–24 (testimony of Craig Jenson); Trans. of July 7, 1979 at 196, 202, 204–08, 224–26 (testimony of Norman Taylor). In the Cedars-Sinai Complex, representatives of the Church were allowed to move freely throughout the complex prior to 9:00 A.M. Trans. of July 13, 1979 at 119 (testimony of Heber Jentzsch); Trans. of July 12, 1979 at 23 (testimony of Janet Miller); Trans. of July 12, 1979 at 157/B (testimony of David Butterworth). In the Information Bureau, from 9:00 A.M. until the afternoon representatives were excluded. Trans. of July 11, 1979 at 203 (testimony of Luther Shaffer). This exclusion was made because a group of about 10–20 members of the Church entered the Information Bureau prior to 9:00 A.M. with brooms and mops endangering the safety of the agents and interfering with the performance of their duties. See Trans. of July 12, 1979 at 159, 161, 168 (testimony of David Butterworth); Trans. of August 27, 1979 at 233–34. In the afternoon, tours through the Information Bureau for Church representatives were conducted by the agents about every half hour. Trans. of July 9, 1979 at 240–41 (testimony of Barry Weissman); Trans. of July 11, 1979 at 202–03, 221 (testimony of Luther Shaffer). Accordingly the Court finds that the government fully complied with Rule 41(d). Moreover, it is interesting to note that failure even to complete an inventory is merely a ministerial violation which does not affect the validity of the search. *Reisgo v. United States,* 285 F. 740, 741 (5th Cir. 1923). *See Nordelli v. United States,* 24 F.2d 665, 667 (9th Cir. 1928); *United States v. Hooper,* 320 F.Supp. 507, 509–10 (E.D.Tenn.1969), *aff'd,* 438 F.2d 968 (5th Cir.) *cert. denied,* 400 U.S. 929, 91 S.Ct. 189, 27 L.Ed.2d 190 (1970).

## VII. THE SCOPE OF THE SEARCHES WERE REASONABLE AND NOT GENERAL.

To a significant extent, the defendants' posture in this case is twisted. The government has indicated it will seek to introduce into evidence at the trial of this case 201 documents seized at the searches in California. The defendants have made no attempt to directly challenge the legality of the seizure of these case-in-chief documents. In fact, they have introduced exhibits which illustrate their opinion that 95% of the case-in-chief documents were described in the warrant, and thus properly seized. *See* Submission of List of Case-In-Chief Documents with Gennet Classification and United States Response to that Classification (August 15, 1979). Moreover, they contend that it is the Court's duty to examine each and every document seized during the searches to determine the validity of its seizure, while indicating their belief that it would be error for the Court to look at the case-in-chief documents prior to trial. *Compare* Trans. of August 29, 1979 at 406, *with,* Motion for Return of Government's Indexed Case-in-Chief Documents (September 4, 1979) and Motion to Strike Appendix to Government's Analysis of Case-in-Chief Documents Compared to Ginnet Evaluation (September 4, 1979). Thus, it is the defendants' somewhat bizarre "theory of the

case," that the Court is to decide whether the government can introduce the 201 case-in-chief documents at trial be examining everything seized during the search except the 201 case-in-chief documents.

In the usual case, the defendant directly challenges the validity of the seizure of the evidence which the government seeks to introduce at trial. Most defendants proceed in this manner because seizures are separable. Each item the government seeks to introduce into evidence is examined separately; those seized improperly are suppressed, while those seized properly are not suppressed. Merely because some evidence is seized beyond the scope of the warrant does not taint that evidence which has been properly seized. *See e. g., United States v. Castle,* 213 F.Supp. 56 (D.D.C.1962), *aff'd,* 347 F.2d 492 (1964), *cert. denied,* 381 U.S. 929, 953, 85 S.Ct. 1568, 1811, 14 L.Ed.2d 687, 726 (1965); *Brooks v. United States,* 416 F.2d 1044, 1049–50 (5th Cir. 1969), *cert. denied,* 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970); *United States v. Holmes,* 452 F.2d 249, 259 (7th Cir. 1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479, 407 U.S. 909, 92 S.Ct. 2433, 32 L.Ed.2d 683 (1972); *United States v. Mendoza,* 473 F.2d 692, 696 (5th Cir. 1973); *United States v. Artieri,* 491 F.2d 440, 445–46 (2d Cir.), *cert. denied,* 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974); *United States v. Daniels,* 549 F.2d 665, 668 (9th Cir. 1977); *United States v. Forsythe,* 560 F.2d 1127, 1134 (3d Cir. 1977).

For the purposes of this case, the key in this line is *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). In *Andresen,* the Supreme Court affirmed the conviction of the defendant on one count of false pretenses and three counts of misappropriation by a fiduciary. *Id.* at 469, 484, 96 S.Ct. 2737. The defendant challenged the reasonableness of the searches and seizures from his corporation and his law office. *Id.* at 467, 96 S.Ct. 2737. A single document from the corporation, and seventeen items from his law office were introduced into evidence at his trial. *Id.* There was evidence that between 2% and 3% of the files in the law office were seized

and less than 5% of the corporation's files were seized. *Id.* at 466–67, 96 S.Ct. 2737. Of the 52 items seized from the offices of the corporation, 45 were returned and the trial court suppressed six. Of the 28 items seized from the law office, seven were returned and four were suppressed. *Id.* at 467, 96 S.Ct. 2737. In the course of its opinion, the Court observed, "The record discloses that the officials executing the warrants seized numerous papers that were not introduced into evidence. Although we are not informed of their content, we observe that to the extent such papers were not within the scope of the warrants or were otherwise improperly seized, the State was correct in returning them voluntarily and the trial judge was correct in suppressing others." *Id.* at 482, 96 S.Ct. at 2749 n.11. Thus, the Court explicitly approved a document-by-document approach. Those properly seized could be used in evidence even though at the offices of the corporation only one of the 52 items seized was ultimately determined to be properly seized. Therefore, *Andresen* can be read to hold that even if most of the documents seized by a valid warrant have not been properly seized, those properly seized can be introduced into evidence at trial.

The defendants filed a special pleading just to meet the challenge *Andresen* presents to their "theory of the case." Defendants' Memorandum on the Applicability of *Andresen v. Maryland* to these Proceedings (August 24, 1979). In order to counteract the *Andresen* holding, the defendants cite essentially five cases. Each of these cases can be easily distinguished.

In *Kremen v. United States,* 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957) (per curiam) the entire contents of the defendants' cabin were seized without a search warrant. *Id.* at 347–48, 77 S.Ct. 828. An eleven-page appendix detailing the personal items seized accompanies the opinion. *Id.* at 349–59, 77 S.Ct. 828. The Court held that the convictions must be set aside because evidence from the cabins was introduced at trial. However, the Court recognized that "the evidence seized from the persons of the

petitioners might have been legally admissible." Thus, the Court did not refuse to distinguish between what was properly and improperly seized. Of course, in this case there are search warrants.

In *United States v. Rettig*, 589 F.2d 418 (9th Cir. 1978), federal agents sought to obtain evidence of a massive cocaine conspiracy. *Id.* at 420. A federal Magistrate declined to issue the search warrant. *Id.* The next day, the agents went to a state court judge and sought a warrant to seize evidence of possession of marijuana. *Id.* The Ninth Circuit found that the warrant was used as an instrument for conducting the search for which permission had been denied on the previous day, and that the actual search pertained to evidence of the cocaine charge, not to the possession of marijuana. *Id.* at 412. The court did *not* refuse to permit the introduction of properly seized evidence. Instead, the court ruled that under the circumstances, such a determination was impossible. *Id.* at 423. In this case, as the defendants have admitted in their pleading, it is possible to determine which discrete items of evidence were within the bounds permitted by the warrant. Thus, *Rettig* is completely inapposite.

In *Application of Lafayette Academy, Inc.*, 462 F.Supp. 767 (D.R.I.1978), the court ruled that the warrant was a broad and general warrant; thus, severability was not permitted. *Id.* at 772. This Court has determined that the warrant in this case was not defective.

The defendants' citation of *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1975) can be described as disingenuous at best. In *VonderAhe*, agents arrived at the home and office of a dentist suspected of tax fraud and removed "practically every piece of paper they could lay their hands on." *Id.* at 365. The government had information that the dentist kept two sets of books—one for audits (white) and one for actual receipts (yellow sheets and green cards). *Id.* at 366. Despite the fact that the agents knew what they were looking for and where it was, the warrants were extremely broad. *Id.* The agents in executing the warrants made a room-by-room search of the premises including the purse of a Mrs. Perez who was visiting the dentist's wife. *Id.* at 367. The Court found that there was no probable cause for the issuance of the warrants except for the yellow sheets and green cards, *id.* at 369, and that the warrants were general warrants. *Id.* at 366. What remedy did the Court provide to the dentist? The Ninth Circuit in *VonderAhe* ordered all of the seized property returned *except for the yellow and green cards. Id.* at 372. One could not imagine a more persuasive case for severability than *VonderAhe*: despite an invalid warrant, and seizure of every piece of paper in a man's home and office, the Court ordered only the return of the improperly seized material. The following language in the case is instructive:

The VonderAhes have asked us to invoke in their favor what has become known as the "exclusionary rule," i. e., to decree at this time that all records seized, including yellow sheets and green cards and any leads therefrom cannot be introduced in any proceeding, civil or criminal against them. However, if the facts are, as represented, that the taxpayers by their own wrong, deliberately concealed income and failed to pay taxes thereon, it would seem to be the *height of inequity* for the courts to enable them to profit thereby. Using equity as the standard, the *warrants* as issued restricted to the yellow sheets and green cards would have been reasonable; beyond these records they were *too* broad. Although the manner of *execution* was quite *unjustified,* the *penalty of exclusion* which the taxpayers would impose is *equally unjustified.* Our present task is to place the government's allegedly unlawful procedure in obtaining and executing the warrants and the VonderAhes' allegedly unlawful concealment on the mythical scales of justice, and observe the balance. Observing this balance (or possibly imbalance), we believe that justice can best be achieved by reversing the District Court dismissing the complaint and, upon remand, directing the District Court to grant the injunctive relief sought by ap-

pellants *except as to the yellow sheets and green cards,* copies of which the government may retain and use subject, however, to any and all objections thereto, including objections based on the Fifth Amendment, in any proceeding, civil or criminal, which may be raised by the VonderAhes.

*Id.* at 372 (emphasis added).

Finally, the defendants rely on *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) which involves the seizure of magazines, films, and other objects from a bookstore on the basis of a New York obscenity statute. *Id.* at 2321. An investigator purchased two reels of film from a bookstore which he believed to be obscene. *Id.* at 2322. He took the film to a Town Justice for a search warrant. The Town Justice agreed that the films were obscene and drew up a warrant for the seizure of the films. The Town Justice then proceeded to the bookstore with some state police investigators to view the other material in the store. The Town Justice viewed and found to be obscene 23 films, 4 peep-shows, and 397 magazines. *Id.* at 2322–23. As each item was seized, it was logged on the warrant. The Court held that the warrant was invalid because it did not even purport to describe particularly the things to be seized, *Id.* at 2324, and was a general warrant. *Id.* Furthermore, the Court found that the Town Justice did not manifest that neutrality and detachment required of a judicial officer when presented with a warrant for a search and seizure. *Id.* In the case before this Court, the warrant was proper and there is no allegation that the Magistrate lacked the neutrality and detachment required of a judicial officer.

Accordingly, the defendants' attempt to force the Court to focus exclusively on the material seized which is not being put into evidence is misguided. The cases relied on by the defendants show that where the warrant is valid, and severability is possible, only material which has been illegally seized is suppressed.

Nevertheless, some cases not cited by the defendants' team of attorneys do provide that at some point an entire search may become so unreasonable that its unreasonableness infects the seizure of each and every item asported. *United States v. Fernandez,* 430 F.Supp. 794, 801 (N.D.Cal.1976); *United States v. Leta,* 332 F.Supp. 1357 (M.D.Pa.1971). Accordingly, the Court shall examine the reasonableness of the entire search to be completely certain that justice is done in this case.

### A. *The Standard to be Applied.*

█ The defendants argue that the standard to be applied to the searches of the Church's premises is "scrupulous exactitude." In support of this contention the defendants rely on the Supreme Court's decision in *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). In *Stanford,* Texas law enforcement officers obtained a warrant to search for evidence of violations of the Texas Suppression Act which outlawed the Communist Party. *Id.* at 477, 85 S.Ct. 506. The officers gathered up about half the books they found in the house including works of Karl Marx, Jean Paul Sartre, Theodore Draper, Fidel Castro, Earl Browder, Pope John XXIII and Mr. Justice Hugo L. Black. *Id.* at 479–80, 85 S.Ct. 506. The officers also seized private papers and documents including a marriage certificate, insurance policies, household bills and receipts and personal correspondence. *Id.* at 480, 85 S.Ct. 506. Although the warrant called for the seizure of, among other things, "records of the Communist Party" and "party list and dues payments," no such material was found. *Id.* at 480, 85 S.Ct. 506. The petitioner moved for the return of this property. *Id.* The Court ordered it returned on the ground that the warrant was a general warrant. *Id.* In the course of its opinion, the Court held that:

the constitutional requirement that warrants must particularly describe the "things to be seized" is to be accorded the most scrupulous exactitude when the "things" are books, *and the basis for their seizure is the ideas they contain.*

*Id.* at 485, 85 S.Ct. at 511–512 (emphasis added). Thus, the particularity of a warrant must meet the scrupulous exactitude test when the items to be seized are books, and they are sought for the ideas they contain. *Id.* To make perfectly clear that the latter condition was not to be ignored, the Court in *Stanford* added the following footnote:

> The word "books" in the context of a phrase like "books and records" has, of course, a quite different meaning. A "book" which is no more than a ledger of an unlawful enterprise thus might stand on quite different constitutional footing from the books involved in the present case. . . . And in some situations books even of the kind seized here might, for the purposes of the Fourth Amendment, be constitutionally indistinguishable from other goods—e. g., if the books were stolen.

*Id.* at 485 n.16, 85 S.Ct. at 512 n.16. Thus, in order to determine whether the warrant in this case must meet the scrupulous exactitude standard, the Court must decide whether the documents sought were wanted for the ideas they contain. Based on the warrant and affidavit, it is clear that no documents were sought for the ideas they contain. In fact, the memoranda sought are classic examples of "ledger(s) of an unlawful enterprise" and "stolen" written material. The warrant sought hundreds of documents allegedly stolen from the government, and written material which allegedly detailed the planning, operation, and handling of such stolen material, as well as material prepared in order to cover up these actions. These documents were not sought as obscene or communist material; they were merely sought as contraband and ledgers of an unlawful enterprise. Therefore, the scrupulous exactitude test cannot be invoked. Merely because the defendants kept their offices in a building belonging to the Church of Scientology does not insulate their actions from the process of law.

The point is made even clearer by comparing the defendants' contentions with the Supreme Court's decision in *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). There, a warrant had been issued for the seizure of photographs of demonstrators at the Stanford University Hospital. *Id.* at 1974. The photographs had been taken by a Stanford student; who was at the demonstration as a reporter for the *Stanford Daily*, a student newspaper. *Id.* The warrant affidavit contained no indication that members of the *Daily* staff were involved in any unlawful acts. *Id.* at 1974. Thus, they were innocent bystanders. Furthermore, the material sought was a third party's photographs of a newsworthy event, rather than ledgers of a criminal enterprise or contraband. In this case, the premises were not those of innocent third parties but those of people about whom there was probable cause to believe involvement in numerous criminal activities. Furthermore, the items sought by the warrant did not result from protected first amendment activity, as did the photographs in *Zurcher*. The material sought in this case was not obtained through newsgathering. Instead, there was probable cause to believe it was stolen through burglaries of government offices. These allegedly stolen documents, memoranda detailing the plans to obtain and then hide their theft, bear only a remote relationship to materials seized in *Zurcher*. Accordingly, the defendants have failed to make out any facts which would require the application of the scrupulous exactitude test.

Although the Court rejects the defendants' attempt to invoke a higher standard, the Court recognizes that the true standard, reasonableness, is not a mechanical one. The nature of the material sought, and its location, are important elements in the application of the test. Although the scrupulous exactitude test does not apply, the Court has examined the facts and circumstances of this case with the utmost care in order to determine the reasonableness of the government's actions in conducting these searches. Of course, the government is required to act with more care than if they were looking for heroin in a tool shed. What would be reasonable there would be

inadequate in a search for documents in a Church.

### B. *The Geographical Scope of the Search.*

■ The defendants contend that the agents conducted general and exploratory searches outside the geographical bounds of the warrants. The facts do not support the defendants' contention.

The warrant for the Fifield Manor described the premises to be searched as follows:

Fifield Manor, 5930 West Franklin Avenue, Hollywood, California, more particularly on so much of the premises described below as consists of the *suite of offices of Mr. Henning Heldt* located at 5930 West Franklin Avenue, Hollywood, California, a seven-story victorian building originally used as a hotel, known as "Fifield Manor," with entrance at the Franklin address as well as 1840 Tamarind Avenue. An information booth is located immediately within the main entrance and adjacent to the information booth is an elevator providing access to the upper six floors. The first through the fourth floors and approximately one-half of the fifth floor contain hotel-type rooms designed to house visiting students. Additionally, portions of the first floor are devoted to dining, cooking and recreation facilities as well as several offices used in hotel administration. The remaining half of the fifth floor, as well as the sixth and seventh floors, in their entirety, house the offices of the "Guardian Office—U.S." of the Founding Church of Scientology in the United States. The *office of Mr. Henning Heldt*, the Deputy Guardian for the United States is located on the sixth floor, the last office on the left-hand side of the corridor.

Thus, the warrant called for the agents to enter the lobby, proceed via the elevator adjacent to the information booth to the sixth floor, and turn right off the elevator to the suite of offices of Henning Heldt. That is exactly what the agents did. Trans. of July 20, 1979 at 6003. The only other substantial activity in the Fifield Manor was the securing of the hallway outside the office of Henning Heldt for the protection of the agents and to prevent the destruction of evidence. Trans. of July 20, 1979 at 6008. Although there was testimony that agents may have quickly scanned some areas of the basement and elevator area of several floors, there is no credible evidence to indicate that any rooms were entered, or documents read. The agents were merely insuring that no interference would be mounted. *See* Trans. of August 22, 1979 at 28–29 (always secure area). Certainly such minimal defensive activity cannot render the search of the Heldt suite a general search. *Cf. Terry v. Ohio*, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (Court recognized that the personal security of police officer is to be factor in determination of reasonableness).[14]

The only controversial question with respect to the scope of the Fifield Manor search was the activity in Janet Lawrence's office and the telex room. In deciding this issue, the Court was greatly aided by the view of the premises taken at the defendants' request. As one enters the inner office of Henning Heldt, one is struck by the appearance of a hut across the terrace of the roof.[15] Access to the hut is available through French doors in the Heldt office. From the vantage point of an agent attempting to locate the boundary of the Heldt suite, it would be reasonable to assume that this hut, right outside the doors

14. In fact, the agents at the Manor must be complimented for the way they restricted their search. Certain defense counsel have argued that there was a room that was never entered only doors away from the Heldt suite which was plainly marked to indicate that it would contain "programs." It is defense counsel's contention that this oversight reflects poorly on those executing the warrant. However, the

Court must disagree. It evidences the intention of those conducting the search not to let their attention be diverted and to stay within the four corners of the warrant.

15. The Court paced off the distance between the Heldt office and the hut. The distance is approximately nine feet.

of the Heldt office, would be part of the suite. Much has been made of the strict definition of a "suite." Webster's Third New International Dictionary defines "suite" as "a series or group of things forming a unit or constituting a complement or collection: SET: as a (1): a group of rooms designed for occupancy as a unit." Since the nearest entrance to the hut was through the office of Henning Heldt, it was logical to assume that those offices formed a unit. In fact, Janet Lawrence testified that she, and her co-workers in the hut, had to use the restroom in the Heldt office. Trans. of August 29, 1979 at 326. She further testified that on the day of the search the office was unmarked; thus, there was nothing to indicate that it did not constitute part of the Heldt suite. Trans. of August 29, 1979 at 346–47.

Similar logic applies to the telex room. The only other entrance to the roof terrace is through French doors in the telex room. Together, Heldt's office, the telex room, and the hut form a logical collection of connecting rooms apparently designed for use as a single unit.

Furthermore, had the agents improperly strayed beyond the bounds of the Heldt suite, the remedy, at most, would be to suppress the evidence seized from these areas. The facts are that nothing was seized from the telex room, Trans. of July 21, 1979 at 6273, and no case-in-chief documents were seized from the office of Janet Lawrence. In this case, the agents, in good faith, came to the conclusion that the telex room and the hut were parts of the Heldt suite. Trans. of July 18, 1979 at 5637; Trans. of July 20, 1979 at 5988, 6120–26; Trans. of July 21, 1979 at 6270. To suggest that this decision rendered the entire search a general exploratory search is untenable.

The warrant for the Cedars-Sinai Complex described the premises to be searched as follows:

Cedars-Sinai Complex, 4833 Fountain Avenue, Hollywood, California, and more particularly on the first floor area housing the offices occupied by the Deputy Guardian for Information and his staff and personnel, in the premises described below:

A building complex known as Cedar-Sinai located at 4833 Fountain Avenue, Hollywood, California, previously known as the Cedars of Lebanon Hospital. The building is creme-colored concrete, multi-winged, and occupies the entire square block. It is surrounded by a six-foot chain link fence with barbed wire on top. A blue sign on each of the four corners identifies the property as "Church of Scientology." The building is eight stories high with a ten-story central tower. On the south of the building is Fountain Avenue, on the north is Sunset Boulevard, on the east is Berendo Street, and on the west is Catalina Street. The only entrance is through a guarded gate on Catalina Street.

Instantaneous with their entry into the Cedars Complex, the agents attempted to locate the Information Bureau. See Trans. of August 23, 1979 at 165. Their efforts were stymied by the unwillingness of the Church personnel to assist them in their attempt. Trans. of July 9, 1979 at 61–63 (testimony of Dennis Young); id. at 182–83 (testimony of Christopher Lynch); Trans. of July 11, 1979 at 216 (testimony of Luther Shaffer). Preliminary search teams were dispatched throughout the building. These teams were to scan the entire building in order to secure the premises, determine who was present, and to locate the file cabinets described in the affidavit. Trans. of August 27, 1979 at 17–19. These teams were not to search file cabinets, but only report back what they found. Id. at 19–20.

As part of the preliminary search, the agents went to the basement of the Services Building when smoke was seen pouring from the boiler room. Trans. of July 9, 1979 at 189 (testimony of Christopher Lynch). The agents' concern was exacerbated by the statement in the search warrant affidavit that the boiler room posed a security risk to the Information Bureau. Trans. of August 23, 1979 at 116. The agents clipped padlocks after failing in their attempt to get keys to several rooms

in the basement. Trans. of August 27, 1979 at 104. There is no evidence that anything was seized from these rooms.

Agents began searching an area labeled the "Action Bureau". Trans. of July 16, 1973 at 243–44. This area was in close proximity to the Information Bureau. The few documents seized from these offices were returned to the Church. *Id.* at 444–45. The agent in charge of searching this area had a good-faith belief that it was an annex of the Information Bureau while he was searching it. *Id.* at 244.

Finally, a telephone equipment room near the Information Bureau was forcibly entered by an agent who heard strange noises coming from the room. Defendants' Exhibit 543A.

Once again, in determining the reasonableness of the agents' actions, the Court is greatly assisted by the view of the premises performed at the defendants' request. The Cedars Complex is a mass of confusing corridors, tunnels, and offices. At the time of the search, the building was being fully renovated from a hospital to an office building. Many of the hospital signs had yet to be removed. The agents were unable to gain entry into the Information Bureau. The affidavit indicated that only the Information Bureau had moved into the complex. Trans. of August 24, 1979 at 33. Scientology personnel failed to indicate the location of those offices to the agents. The size of the complex is enormous. The agents had a duty to prevent the destruction of evidence. Together, these circumstances made a degree of confusion reasonable. In light of all these factors, the Court finds that the agents, in their search of the Cedars Complex, acted reasonably and in good faith. Thus, the geographical scope of the search did not render it general or exploratory.

The defendants also contend that any searches except for those of filing cabinets were outside the scope of the warrant. First, the warrants did not limit the searches to filing cabinets. In the Manor, it was limited to the suite of offices of Henning Heldt, and in the Cedars Complex it was the offices occupied by the Deputy

Guardian for Information and his staff and personnel. Second, nothing in the affidavit limited the location of the documents to filing cabinets. A fair reading of the affidavit would indicate that the documents described in the warrant could be found in places other than the filing cabinets. Finally, nothing in the Court of Appeals decision upholding the facial validity of the District of Columbia warrant limited its validity to filing cabinets. *In re: Search Warrant Dated July 4, 1977, supra.* Accordingly, the agents acted reasonably and in good faith, and did not exceed the geographical bounds of the warrant in searching desks, in/out baskets, etc., in the offices specified in the warrant.

## VIII. THE SEIZURE BY THE AGENTS OF SOME ITEMS NOT WITHIN THE WARRANT DOES NOT REQUIRE THE SUPPRESSION OF ALL EVIDENCE SEIZED.

The Court will now turn to the issue on which defense counsel have spent most of their energies—whether the seizure by the agents of documents outside the warrant requires the suppression of all evidence seized. In support of their legal contention, the defendants make the following factual arguments. First, the defendants contend that there was no attempt on the part of the government to restrict the searches and seizures to what was in the warrant. Second, the defendants contend that the vast majority of documents seized were outside the warrant. The Court finds that the government made good-faith and reasonable efforts to limit the searches and seizures to items within the warrants or otherwise legally seizable. Finally, the Court finds that the defendants have failed to sustain their burden with respect to the degree of documents seized outside the scope of the warrant.

A. *The Government Made Reasonable Attempts to Limit the Search and Seizure to Items Legally Seizable.*

■ In language especially appropriate for this case, the Supreme Court observed

in *Andresen v. Maryland*, 427 U.S. 463, 480 n.10, 96 S.Ct. 2737, 2749 n.10, 49 L.Ed.2d 627 (1976):

> The complexity of an illegal scheme may not be used as a shield to avoid detection when the state has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.

In order to determine the reasonableness of the government's conduct in this case, the Court must view the problem facing the government when the allegations in the affidavit became known. There was probable cause to believe that the leaders of a large religious organization were involved in complex, sophisticated conspiracies to illegally obtain government documents and to cover up their activities. The government had probable cause to believe that evidence of these and related crimes was located in the offices of the Church in two locations. The government had probable cause to believe that at one location there would be 250 filing cabinets with evidence of criminal activity. Due to the nature of the allegations, the reasonable thing to do would be to obtain the services of numerous agents of the Federal Bureau of Investigation [FBI] to conduct the searches, and to prepare these agents for their task by conducting an extensive briefing session. That is what the government did in this case.

On July 6, 1977, about 100 agents of the FBI were informed that they would be participating in a search two days hence. They were also told that their presence would be required at a briefing beginning in the morning of the following day. *See e. g.*, Trans. of August 8, 1979 at 16.

The July 7, 1977 briefing began about 8:00 to 8:30 A.M., with a general briefing for about 100 agents who were to participate in the search the following day. Trans. of July 16, 1979 at 94, 142–43. It lasted until about 5:00 P.M. *Id.* at 151. The speakers included the Assistant Director of the Los Angeles Field Office of the FBI, Agent Gebhardt; the agents who would be in charge of the searches at each location, Agents McCarthy and Lindbergh; the case agents for Los Angeles and Washington, D. C., Agents Tittle and Varley; and two Assistant United States Attorneys who were handling the case in the District of Columbia. *Id.* at 158; Trans. of August 23, 1979 at 9; Trans. of August 17, 1979 at 80. The morning session involved a general discussion of the investigation up to that time, the physical set-up of the buildings, and the manner in which the search was to be conducted. Trans. of July 16, 1977 at 164. The agents were told that they were to be searching a church; they were informed of the priest-penitent privilege, and were told to act accordingly. *Id.* at 164, 231; Trans. of August 23, 1979 at 13; Trans. of August 22, 1979 at 21–22. They were told that the Church of Scientology had over three million adherents and that they could expect unfavorable press coverage. Trans. of July 16, 1979 at 188. They were told that the members of the Church were peaceful, passive people and that violence would be unnecessary. *Id.* at 171–72. They were told that patience and restraint were needed. *Id.* at 171–72. They were told to initially secure the building because destruction of evidence was feared. *Id.* at 194–95. They were told what types of files to look for. *Id.* at 204. They were told to read the affidavit. *Id.* at 161. Each item in the description of property to be seized was discussed. *Id.* at 275. The agents were told that it was possible that they could find evidence which could be used for probable cause elsewhere. *Id.* at 277. They were told to be sure to prepare FD 302's, which are forms used by the FBI to log what is seized in a search. *Id.* at 230. They were told that the search would probably result in litigation. *Id.* at 217. Most of the agents summarized this advice with the word "professional,"—the agents were to conduct themselves in the highest professional manner. *See e. g.*, Trans. of August 22, 1979 at 21.

Sometime before lunch, the copies of the affidavit were distributed. Trans. of July 16, 1979 at 145. An hour break was given to allow the agents to read the affidavit.

*Id.* at 148, 153, 154. Following the break, there was a question and answer session. *Id.* at 148, 153, 225. Later, the meeting was divided into smaller groups according to the role the agents would be performing and where it would be performed. *Id.* at 144, 149, 153, 225. Thus, the entry teams for the Manor and Cedars met separately, as did the document search teams, and the photography teams.

On the day of the search, the warrant and affidavit were available to the agents. *See* note 13 *supra.* In addition, supervisory personnel, team leaders, and lawyers for the United States Attorney's Office and the FBI were available and often consulted. Trans. of July 16, 1979 at 288; Trans. of July 18, 1979 at 5575–76; Trans. of July 20, 1979 at 5999–6000, 6002, 6212; Trans. of July 21, 1979 at 6257, 6276, 6279, 6382; Trans. of August 16, 1979 at 122, 139, 166; Trans. of August 17, 1979 at 215; Trans. of August 20, 1979 at 101; Trans. of August 21, 1979 at 111, 127–28; Trans. of August 22, 1979 at 55; Trans. of August 23, 1979 at 87; Trans. of August 24, 1979 at 148; Trans. of August 27, 1979 at 50; Trans. of August 28, 1979 at 102, 259–60.

As the search progressed in the Information Bureau at Cedars, it became apparent to the FBI supervisory personnel that the manpower on hand was inadequate. Trans. of August 24, 1979 at 35. Therefore, additional agents were ordered to proceed to the scene. *Id.* at 35. Some of these agents had not attended the briefings of July 7. *Id.* at 35–36. Instead, they were given more limited briefings as they arrived, first by FBI supervisory personnel, and then by their team leaders. *Id.* at 36, 39, 89–91, 126. The late-arriving agents' attention was directed especially to those items in the warrant which earlier agents had found to be prevalent in that area. *Id.* at 121. They were told to act in the utmost professional manner. *Id.* at 43. The warrant and affidavit were made available for these agents to read. *Id.* at 42. While searching, the warrant, affidavit, and FBI personnel were available for consultation. *Id.* at 43. The arriving agents were told that if they had any question, they were to consult with

team leaders, other agents, and their superiors. *Id.*

The testimony adduced at the hearing showed that the agents understood the warrant and the affidavit, and made good faith and reasonable efforts to comply with them. The agents understood item 162 of the description of property. *See e. g.,* Trans. of August 21, 1979 at 143 (Agent Valencia: "162 dealt with obtaining instrumentalities and fruits of a conspiracy dealing with obstruction of justice and theft of government property as supported by the affidavit."); Trans. of August 16, 1979 at 195 (Agent Breen: "if there were other documents not listed in the description of property here that appeared to indicate a theft of Government property had occurred, . . . ."); Trans. of July 18, 1979 at 5496 (Agent Stovall: the objectives of the conspiracies were "to steal government documents."). In addition, the agents seized a very small percentage of the documents they went through. *See e. g.,* Trans. of July 16, 1979 at 300 (less than 3%); Trans. of August 22, 1979 at 122 (1.5%); Trans. of August 22, 1979 at 52 (less than 1%).

The defendants have also argued that the agents exceeded the bounds of the warrant by taking photographs during the execution of the warrant. These photographs were taken by the FBI in order to accurately record the events of the search by showing that Church personnel could freely move about the premises, to show the condition of the premises before and after the search. Trans. of July 17, 1979 at 504; Trans. of August 23, 1979 at 205; Trans. of August 24, 1979 at 15–16; Trans. of August 27, 1979 at 170; Trans. of August 20, 1979 at 148–49. The defendants contend that such efforts to record the events of the day of the search violate the first amendment rights of the defendants. The Court disagrees. If you can see it, you can photograph it, "since this amounts to nothing more than making a record, not differing essentially from a full written description." Prosser, Law of Torts at 809 (4th ed. 1971). The agents were legitimately on the premises to conduct the search and observe the

people, and the conditions of the premises. Therefore, it was proper to take photographs. The Court finds that the creation of such a record is a good police practice.

Accordingly, the Court finds that the government, through its agents, made adequate, good faith and reasonable efforts to limit their seizures to evidence which could be properly seized.

### B. *The Defendants Have Failed to Show that Scope of the Seizures Was Unreasonable.*

The "plain view" doctrine has received the Supreme Court's explicit approval. *See Coolidge v. New Hampshire,* 403 U.S. 443, 464–72, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In order to justify a seizure on plain view grounds, several conditions must be met. First, the initial intrusion which brings the agent within plain view of an article must be proper. *Coolidge v. New Hampshire, supra* at 465, 91 S.Ct. 2022. Second, the incriminating article must be noticed inadvertently. *Id.* at 467–71 & n.25, 91 S.Ct. 2022. Third, the article must be of an incriminating character which is evident immediately upon its discovery. *Id.* at 465, 91 S.Ct. 2022.

Although none of the documents designated by the government to be used in its case-in-chief were seized under the plain view doctrine, the application of this concept to the searches is necessary in order to evaluate the defendants' claims with respect to the scope and breadth of the documents seized.

 The defendants contend that the plain view doctrine is inapplicable to this case, because the search involved documents, the evidence was not incriminating,

and their discovery was not inadvertent. The Court disagrees.

In this case, the initial intrusion which brought the documents within the plain view of the agents was proper. In order to execute the warrants, the agents were required to glance through the documents in the areas designated by the warrant.[16] This case does not present the problem faced by the Supreme Court in *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In *Stanley,* the agents while searching for gambling paraphernalia came across movies which they viewed by using a nearby projector. *Id.* at 558, 89 S.Ct. 1243. In this case, the agents did not have to do anything to determine that the documents were incriminating except that which they were required to do to execute the warrants: look at documents. The agents in *Stanley* did not have to view a movie to locate gambling paraphernalia.

The second requirement is that the discovery must be inadvertent. If the execution of the warrant is merely a subterfuge to search for other evidence, the plain view doctrine cannot be invoked. *Coolidge v. New Hampshire, supra* 403 U.S. at 469–71, 91 S.Ct. 2022. If the discovery is anticipated and the location is known, agents are compelled to obtain a warrant. *Id.* at 470–71, 91 S.Ct. 2022. There has been no credible evidence in this case to indicate that the agents knew in advance the nature or location of other incriminating evidence or that the warrant was obtained as a subterfuge.[17]

Third, the article seized must be of an incriminating character. Immediately upon observing the article, the agent must have probable cause for its seizure. *See United*

---

**16.** The defendants contend that only item 162 in the description of property required the agents to glance through the documents. The Court must reject this contention. Many documents listed in the description of property would not be self-evident by merely glancing at the format and title. *See e. g.* items 149–51, 157.

**17.** One Church witness testified that he stumbled into an FBI briefing unnoticed and overheard a supervisor telling a group of agents

that their "cover" was that they were looking for stolen government documents, but they really were looking for anything related to the FBI, the Food and Drug Administration, the American Medical Association, and the Better Business Bureau. The Court does not find this testimony to be credible. Besides numerous other indicators, the witness made no mention of this incident in his contemporaneous notes that were produced at the hearing. Trans. of July 7, 1979 at 94.

*States v. Williams,* 385 F.Supp. 1400, 1405 (E.D.Mich.1974). During the search of a cabinet labeled "Confessional Formulary" in the Information Bureau, Special Agent Oppy came across a document [18] which is set out in its entirety in the margin. Trans. of July 17, 1979 at 448–49. After this seizure an order went out for agents to watch for documents marked "red box" because "red box" meant that some of the documents might have been stolen. *See* Trans. of August 27, 1979 at 73.

Aside from red-box data, a second large class of documents were seized under the plain view doctrine. These documents discussed infiltration and covert operations to obtain documents from private and state organizations.[19]

■■■ The Court finds that the agents seizure of red box data, and evidence of covert infiltration of private and state organizations to obtain documents were reasonable. The agents, with knowledge of the warrant and affidavit, had probable cause to believe that this material was evidence of criminal activities. *See United*

*States v. DiGilio,* 538 F.2d 972 (3d Cir.), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 739 (1976). Each and every element of an offense need not be made out beyond a reasonable doubt before evidence can be seized under the plain view doctrine. *United States v. Williams, supra* at 1405. All that is required is probable cause that it is evidence of a crime. The Court finds that the seizure of these two large classes of material were reasonable.[20]

Finally, the defendants contend that the plain view doctrine does not apply to searches for documents. The Court must reject this contention. In *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), holding approved in *Coolidge v. New Hampshire, supra* 403 U.S. at 469 n. 26, 91 S.Ct. 2022, a ledger and certain bills were introduced into evidence in the criminal trial of the petitioner for violations of the National Prohibition Act. *Marron v. United States, supra* at 193, 48 S.Ct. 74. The agents seized the bills and ledger while executing a search warrant for intoxicating liquors and articles for their manufacture.

---

18. "RED BOX DATA INFORMATION SHEET
 1. What *is* Red Box data?
 a) Proof that a Scnist is involved in criminal activities.
 b) Anything illegal that implicates MSH, LRH.
 c) Large amounts of non FOI docs.
 d) Operations against any government group or persons.
 e) *All operations that contain illegal activities.*
 f) Evidence of incriminating activities.
 g) Names and details of confidential financial accts.
 2. Where is Red Box data kept?
 a) Out of date material or finished cycles that can be shredded should 'be.
 b) Large amounts of red box data that is not needed for day to day function but cannot be destroyed is located · with all our NON FOI docs—and· can be called for via CIC.
 c) Small amounts of data that must be kept on hand due to security and frequent use—is to be kept in a briefcase locked up—and is to be marked. (in BI office area)
 3. How is Red Box data, kept on the BI premises, cared for?
 a) This data will be picked up and carried out of the building by the 'owner' immediately upon notification of a raid, search warrant etc.

b) Persons carrying this data (as few as possible) will leave the premises and only return when they have called in and received an 'all clear'. (Details of who goes where with what data will be sorted out later—and drilled)" Government Exhibit 38.

19. *See e. g.* Government Exhibit 111, a Guardian order which states:
 "Program: . . . 12. Simultaneously with the above action, recruit and place operatives in the following places:
 A. STL BBB
 B. STL Post Dispatch
 C. STL Globe

 · · · · ·

 18. Obtain files on Scientology, using inplace operatives, from the following:
 A. STL BBB, including Williams & Schmidt's offices
 B. STL Post, including Adams, McGuires' offices
 C. STL Globe including Bauman's and Shepard's offices . . . .''

20. Some physical evidence was also seized under the plain view doctrine. This included a loaded gun which was seized after the agents were unable to find its owner. Trans. of August 17, 1979 at 124–25.

*Id.* The evidence showed that they searched for and found large quantities of liquor, some of which were in a closet, and that while in the closet, the agents noticed the ledger showing inventories of liquors, receipts, and expenses. *Id.* at 193, 48 S.Ct. 74. Beside the cash register, the agents found the bills. *Id.* The Court upheld the seizure. *Id.* at 199, 48 S.Ct. 74. Later cases stress that *Marron* involved the plain view doctrine. *See Coolidge v. New Hampshire, supra* 403 U.S. at 469 n. 26, 91 S.Ct. 2022.

This Court would not necessarily approve the holding in *Marron*. The care with which a document is examined must be an element in the finding that the plain view doctrine applies. *See Commonwealth v. Hawkins,* 361 Mass. 384, 280 N.E.2d 665 (Mass.1972); *Commonwealth v. Bowers,* 217 Pa.Super. 317, 274 A.2d 546 (1970). If the agents in *Marron* were looking for liquor bottles and related equipment, there was no authority to read the ledger and bills to determine that they were incriminating. But, this case is not *Marron.* Here, the agents were required to glance through the documents to execute the warrant. Thus, incriminating documents can be seized if the three other general requirements are met as they are in this case. *See also United States v. Parker,* 530 F.2d 208, 211–212 (8th Cir. 1976) (address book and ledger seized in search incident to arrest); *United States v. Maude,* 156 U.S.App.D.C. 378, 481 F.2d 1062, 1069–72 (D.C.Cir.1973) (Robinson, J.) (identification cards seized during search for stolen money orders); *United States v. Teller,* 412 F.2d 374, 379 (7th Cir. 1969) (per curiam), *cert. denied,* 402 U.S. 949, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1970) (index cards seized during search for money); *United States v. Cooper,* 409 F.Supp. 364, 368–69 (M.D.Fla.), *aff'd,* 542 F.2d 1171 (5th Cir. 1976) (records of illegal sales and record-keeping seized during lawful examination of logbook of arms dealer).

The Court allowed the defendants to introduce evidence that they commissioned two "scientific" studies which found that about 70% of the documents seized were not within the warrant. Even ignoring the serious logistical problems, these studies offer little assistance to the Court. First, even if they properly measure the percentage of documents improperly seized, these figures alone would be legally irrelevant. *See Andresen v. Maryland, supra.* Second, by ignoring the plain view doctrine, they do not even purport to measure the percentage of documents *legally subject to seizure.* Finally, even accepting these *theoretical* errors, the Court finds the studies to be valueless due to basic analytical flaws in their interpretation of the warrant. For example, the defendants' "expert" insisted that Government exhibit 137 was outside the warrant. Trans. of August 29, 1979 at 215. The document is entitled "Re: Herb." The affidavit states that Meisner's code name was "Herbert." Aff. at 20 n.*. Furthermore, the document goes on to state that "[h]e wants the guards totally off, but for control purposes in monitoring exact actions, we are maintaining it with some additional freedom as he improves." The document is dated May 13, 1977. The affidavit states:

> After June 14, 1976, Meisner was named National Secretary of the Church of Scientology and maintained an office at the Guardian's Office in L. A. However, when the Church discovered that a warrant had been issued for his arrest in D.C., he was removed from any official position with the Church, while retaining functions in an unofficial capacity. This situation continued until sometime in April, 1977 when Meisner indicated that he was tired of waiting and wished to be sent back to D.C. as soon as possible. When Meisner threatened to take the situation in his own hands, he was placed under twenty-four-hour guard and was repeatedly "audited" by the Church. On one occasion he was removed from one building to another handcuffed and gagged. On another he was apprehended by church members in Las Vegas and returned under their custody to Los Angeles where he was again placed under house arrest. (footnote omitted).

Item 162 of the description of property called for the seizure of "[a]ny and all

fruits, instrumentalities, and evidence (at this time unknown) of the crimes of conspiracy, obstruction of justice and theft of government property in violation of 18 U.S. Code §§ 371, 1503 and 641 which facts recited in the accompanying affidavit make out." The Court finds that the document falls within item 162 of the description of property as evidence of the crimes of obstruction of justice and conspiracy.

Besides the studies, the defendants rely on *In re Search Warrant Dated July 4, 1977*, Misc. No. 77–951 (D.D.C. August 24, 1979) and contend that the mere fact that the government returned 40% of the seized documents to the Church indicates the amount that was improperly seized. In this case, the United States has represented to the Court that returned documents were deemed unnecessary. The Court has absolutely no reason to doubt the word of the government representatives in this case. In addition, this procedure was approved by the Supreme Court in *Andresen v. Maryland, supra* 427 U.S. at 482, 96 S.Ct. 2737. Moreover, if the courts take the return of documents as an admission of error, such activity, which should be encouraged, would be chilled: the government will not return property out of fear that it will be interpreted as an admission of impropriety.

Accordingly, the Court finds that the defendants have failed to meet their burden of proof as to the scope of the seizures. Perhaps some documents were seized outside the warrants; however, some error must be expected and is entirely reasonable. There has been no showing that the degree of error was so egregious that the entire search was exploratory or unreasonable.

The defendants' arguments that the searches violated their procedural rights and that the government proceeded in bad faith are also rejected.

### IX. CONCLUSION.

No one in our civilized society is pleased by searches of Churches lasting twenty hours and involving over 150 FBI agents. However, the fourth amendment does not provide a mechanical rule that prevents searches of certain places, at certain times, by more-than-so-many people. The bottom line is reasonableness. Overall, the FBI agents who executed the warrants at issue in this case performed a very difficult job in a most reasonable manner. When the government has probable cause to believe that evidence of criminal activity is present in a particular place, government agents have a responsibility to pursue their investigation. It is most unfortunate that the information which came to the government in this case required that searches be conducted by numerous agents, for long hours, in buildings owned by a Church. However, the fourth amendment cannot become so inflexible that criminal activity can be completely insulated from our criminal justice system by the talismanic invocation of religion. We can only hope that never again in our history will the government be required to perform such an unseemly task.

The Court has examined the documents that the government intends to submit during its case in chief. The Court finds that there is no evidence to indicate that these documents were improperly seized: they are within the warrants and were seized from areas described in the warrants. The government is not barred by the fourth amendment from introducing these documents into evidence at the trial of this case.